**Opinion filed December 15, 2016**



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00174-CV

_____

## IN THE INTEREST OF N.W.D., A CHILD

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-3520-PC**

### M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of the mother and the father of N.W.D. Both parents appeal. The mother presents three issues in which she challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights. The father presents the same three issues and also a fourth issue related to an allegedly omitted finding. We affirm.

After hearing the evidence presented at the final hearing in this case, the trial court terminated the parental rights of both parents under Section 161.003 of the Family Code and appointed the Department of Family and Protective Services as the

permanent managing conservator of the child. *See* TEX. FAM. CODE ANN. § 161.003 (West Supp. 2016). Pursuant to Section 161.003(a), the trial court found that the mother and the father had a mental or emotional illness or a mental deficiency that rendered each parent unable to provide for the physical, emotional, and mental needs of the child; that the illness or deficiency, in all reasonable probability, will continue to render each parent unable to provide for the child's needs until the child's eighteenth birthday; that the Department had made reasonable efforts to return the child to the parents; and that termination would be in the child's best interest. *See id.* § 161.003(a).

The termination of parental rights must be supported by clear and convincing evidence. *Id.* § 161.206 (West 2014). To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking

custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

In their first issue, the parents challenge the legal and factual sufficiency of the evidence to support the trial court's findings that the parents have a mental or emotional illness or a mental deficiency that renders them unable to provide for N.W.D. and that their illness or deficiency will continue to render them unable to do so until N.W.D. turns eighteen.

The record shows that two psychologists, Martin Salazar and Joe Jeffers, testified at trial. Salazar evaluated both parents. He indicated that the mother scored "within the mild range of intellectual disability" and presented a history of ADHD. When she was in school, she was in the "Special Ed" program. The mother had very poor coping skills, became stressed easily, and was overwhelmed with taking care of her child. The mother reported to Salazar that, in the past, the father had physically abused her but that the abuse had recently become "mainly verbal." She also indicated that she has "a difficult time dealing with life in general." Salazar did not believe that the mother had benefited from the classes offered by the Department. He concluded that the mother "more than likely will continue to experience difficulty in her approach to problem-solving, coping with stressful situations, judgment and regulating her emotions and behavior" and that she "is going to require ongoing supervision, support, guidance and assistance, especially in her efforts to effectively parent her child." Salazar indicated that the "child would be in danger" if the mother were permitted to parent the child unsupervised and that the mother's condition would continue until the child was eighteen.

3

Salazar's evaluation of the father resulted in similar findings. The father had a seizure disorder and frontal lobe damage. When he was in school, he was in the "Special Ed" program. The father functioned with a mild range of disability, exhibited poor social skills, had difficulty dealing with stress, and usually exhibited poor judgment. The father's social skills and judgment were such that he would not be able to realize that a situation was potentially dangerous for the child or that the child needed medical attention. The results of the father's evaluation also indicated that he had difficulty with aggression and had the potential to become verbally and physically aggressive. The father's inability to control his anger created a dangerous situation for the child. Salazar recommended anger management, individual counseling, parenting classes, and conjoint therapy but did not know if the father was capable of benefiting from such services. Salazar noted that the father had not benefited from treatment in the past. As with the mother, Salazar concluded that the father would require ongoing supervision to effectively parent a child; he believed that both parents would need "someone to be there to guide them and direct them." Salazar believed that the father's problems with anger and poor judgment would endanger the child's safety and well-being.

Jeffers also evaluated both parents. As part of the evaluation, he conducted intelligence testing. The results of the mother's test indicated that she had a full scale IQ of 61, which corresponded to a percentile rank of 0.5—lower than 99% of the people that have taken the test and in the mild range of intellectual disability. She performed better than expected on the reading and spelling portions of the achievement test. The mother exhibited mild symptoms of clinical depression and had a history of ADHD, but she had no severe personality disorders. Jeffers opined that, although the mother had a sincere desire to parent her son and a sincere love for him, the mother had intellectual and emotional deficiencies that would make it difficult and highly risky for her to provide 24-hour care for her son. Jeffers also

4

testified that those deficiencies would continue for the indefinite future and would be difficult to remediate. Jeffers clarified that the indefinite future included the period up to, and beyond, N.W.D.'s eighteenth birthday.

An additional consideration related to N.W.D.'s needs; Jeffers described N.W.D. as "handicapped" and believed that N.W.D. "very well might need continued support, supervision[,] and remediation" when he is an adult. Jeffers believed that the child would be endangered if the child remained with the mother because she would have difficulty identifying potentially dangerous situations, making decisions, and taking appropriate actions based upon her mental and emotional capabilities. According to Jeffers, what could have been a relatively ideal situation—with the mother and N.W.D. living with the mother's parents and being supervised by the mother's mother—became an untenable and sad situation because of the mother's "difficulties."

Jeffers's evaluation of the father included the same tests given to the mother. Jeffers concluded that, although the father expressed a strong attachment to his son, the father "had intellectual and academic deficiencies that would make it very, very difficult and probably unable to meet the physical, emotional and mental needs" of N.W.D. Jeffers again expressed his concern that the problem was exacerbated because N.W.D. was a special needs child. Jeffers testified that the father had not benefited from the multiple remediation services that had been provided to the father. Jeffers opined that the father would not benefit from services in the future; that the father's deficiencies would continue until N.W.D. reached adulthood; and that, if the father did not live with an appropriate adult who could supervise the father's care of N.W.D., termination of the father's parental rights "might be necessary" for the sake of N.W.D. When asked if there was "any possibility" that the parents could care for N.W.D. between the time of trial and N.W.D.'s eighteenth birthday, Jeffers answered: "Independently, no."

Two licensed professional counselors, Teresa Valero and George Gomez, counseled both parents. Valero provided anger-management services to the father. However, the father denied having a problem with his anger and denied the allegations made by the mother of domestic violence. Valero did not believe that the father was able to make changes that would be necessary in order for him to provide a safe environment for his child. Valero also testified that parenting classes had been provided to both parents but that neither parent was able to demonstrate an ability to apply what they had learned in parenting class.

Gomez indicated that there were domestic violence issues in the parents' relationship and that the parents had obvious learning disabilities. Neither parent completed counseling, and neither was successful in attaining the goals set by Gomez. Gomez believed that the parents would "definitely" need help to parent a child. Gomez did not think that the father could provide for the child financially. The record indicates that both parents received social security benefits due to their disabilities.

Various witnesses testified that the mother was not able to take care of herself. The mother's former employer, Gabriella Sanchez, testified that she had employed the mother to work at a day-care center but that the mother needed constant supervision and was never left alone to supervise any of the children at the day care—regardless of the age of the children. Sanchez indicated that the mother would not know what to do in the event of an emergency. She also indicated that the mother had not bonded with N.W.D. and that others at the day-care center tried to show the mother how to love and nurture her child. Sanchez testified that the father was "[f]orceful" in his interactions with N.W.D. and that the father manipulated and abused the mother.

The mother's mother, S.M., had been awarded permanent guardianship of both the person and the estate of the mother. S.M. indicated that her daughter has

special needs and "will always have to have someone there to tell her to -- to keep her ongoing." According to S.M., the mother's intellectual disability affected her parenting of N.W.D.; the mother was not capable of providing the attention that N.W.D. needed, which resulted in some dangerous situations. S.M. believed that her daughter's inability to take care of N.W.D. would continue through N.W.D.'s eighteenth birthday. The mother cannot drive, cannot take care of her own living arrangements, and cannot manage her finances. S.M. became unable to take care of both the mother and N.W.D., and there were no other family members able to take care of N.W.D. S.M. testified that N.W.D. had special needs and needed constant care; she described his lack of speech and various developmental delays. S.M. was unable to give N.W.D. the care that he needed, and she did not believe that either the mother or the father was able to do so. S.M. believed that it would be in N.W.D.'s best interest to remain with and be adopted by his foster parents.

The Department's caseworker testified that the parents were not able to meet the special needs of N.W.D. and that the Department searched for someone, but did not locate anyone, who could supervise the parents so that N.W.D. could remain in their care. The caseworker believed that termination of the mother's and the father's parental rights would be in N.W.D.'s best interest.

The CASA volunteer testified that N.W.D. had been placed in a foster home and was doing quite well in that home. The CASA volunteer indicated that N.W.D. was a special needs child and that he required more attention than most children. N.W.D. needed to go to therapy and special classes at the school, and neither parent drove. CASA recommended that the parental rights of the mother and the father be terminated and that the foster parents be permitted to adopt N.W.D.

The Department produced clear and convincing evidence from which the trial court could reasonably have formed a firm belief that each parent had a mental or emotional illness or a mental deficiency that rendered the parent unable to provide

for the physical, emotional, and mental needs of N.W.D. and that each parent's illness or deficiency, in all reasonable probability, will continue to render the parent unable to provide for N.W.D.'s needs until his eighteenth birthday. The evidence indicated that neither parent could independently parent N.W.D., a special needs child, and that neither parent lived with an appropriate adult who could supervise the parents' care of N.W.D. We overrule each parent's first issue.

In their second issue, the parents argue that the evidence is legally and factually insufficient to prove that the Department made reasonable efforts to return N.W.D. to the parents. We disagree. The record indicates that the Department provided various services to the parents and that neither parent's situation became such that the Department could return N.W.D. to the parents. The provision of services to a parent ordinarily constitutes a reasonable effort on the part of the Department to return a child to the parent. *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.); *see also In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.). In addition to providing services to the parents, the Department attempted to find someone who could supervise the parents so that they could safely parent N.W.D. The record shows that the Department made reasonable efforts to return the child to his parents. Therefore, we overrule each parent's second issue.

In their third issue, the parents challenge the trial court's findings that termination of their parental rights would be in the best interest of the child. With respect to N.W.D.'s best interest, the record reflects that he had been placed in an appropriate foster home and that he was doing well there. The Department's goal for him was termination and unrelated adoption. Although the parents loved their son and did not want their parental rights to be terminated, the parents were, and will continue to be, unable to take care of their special needs son without supervision. And neither parent has an appropriate adult who is able to provide such supervision.

Clear and convincing evidence indicated that N.W.D. would be endangered if he were returned to his unsupervised parents. Thus, based on the evidence presented at trial and the *Holley* factors, the trial court could reasonably have formed a firm belief or conviction that termination of each parent's parental rights would be in N.W.D.'s best interest. *See Holley*, 544 S.W.2d at 371–72. We hold that the evidence is both legally and factually sufficient to support the trial court's best interest findings, and we overrule each parent's third issue.

The father presents one additional issue. He asserts in his fourth issue that the trial court erred in failing to find that it would be in N.W.D.'s best interest to terminate the parent-child relationship between the father and N.W.D. We disagree. In its order of termination, the trial court specifically made the following finding: "The Court finds by clear and convincing evidence that termination of the parent-child relationship between [the father] and the child . . . is in the child's best interest." The father apparently overlooked the above finding when he reviewed the trial court's order. We overrule the father's fourth issue.

We affirm the trial court's order of termination.

JIM R. WRIGHT
CHIEF JUSTICE

December 15, 2016

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

9